Filed 10/2/15  P. v. Davis CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TONCE DAVIS,<br><br>Defendant and Appellant. | B252614<br><br>(Los Angeles County<br>Super. Ct. No. BA370192) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Clifford L. Klein, Judge.  Affirmed as modified.

Joseph S. Klapach, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jason Tran and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Tonce Davis appeals his convictions for three counts of grand theft. He contends: (1) the evidence was insufficient to prove he acted as an aider and abettor; (2) conviction on only one of the three theft counts was proper; and (3) the trial court erred by twice terminating his self-representation privileges (*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*)). Davis's second contention is meritorious, and we order his three theft convictions consolidated into one count. In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

a. *People's evidence*

(i) *The thefts*

In September 2008, truck driver Byron Jarrett picked up a load of Cricut scrapbook printers from the Provocraft company in Utah for transport to Riverside, California. Jarrett owned his 18-wheeler truck, which was valued at $60,000. He leased or borrowed a 2004 Hyundai trailer, which was valued at approximately $14,000, from B&K Freightliners. The cargo consisted of 15 shrink-wrapped pallets, loaded with a total of 180 boxes. Each box contained one printer, valued between $99 to $199.

On September 28, 2008, while en route, Jarrett stopped in Los Angeles, where he lived, because the load was not due to be delivered until the next morning. He parked the rig on the 5200 block of Crenshaw Boulevard. He locked the doors, rolled up the windows, and padlocked the trailer. The padlocks were heavy duty locks that could be cut only with bolt cutters.

That evening, driving his Escalade, he went to check on the truck. As he approached, he saw his big rig being driven away by Alvin Johnson.[1] A white cargo van, which had no license plate, pulled onto the road with the truck and followed it. Davis was driving the van; a passenger sat in the van's front passenger seat. The big rig moved

---

[1] Johnson was apparently tried separately and is not a party to this appeal.

slowly, starting at approximately three miles per hour, and headed southbound on Crenshaw. Jarrett called 911 and followed the truck and the van. A Los Angeles Police Department (L.A.P.D.) helicopter piloted by Officer Gerardo Camporredondo responded to the 911 call, as did L.A.P.D. ground units.

The big rig made a last-minute left turn onto Slauson Avenue. As it changed lanes to make the turn, the white van pulled alongside Jarrett. Davis looked "dead at" Jarrett as if to see what he was doing and gave him a "mean" or intimidating look. The van then dropped behind Jarrett's vehicle and began following him.

Jarrett, who did not want the persons in the truck or van to know he was following them, continued southbound on Crenshaw. However, the van followed him. At one point, Jarrett momentarily stopped and spoke with a pedestrian with whom he was acquainted; he wanted to alert "somebody what was going on." While he was stopped, the van pulled up to Jarrett "real slow." As it passed by, the van's occupants looked at Jarrett again. The van turned left onto 8th Avenue. Jarrett got back on Crenshaw and returned to Slauson, where he caught up with his truck. The white van was no longer in sight. When the truck reached Western, it made a right turn, as did Jarrett. On Western, police officers were waiting. They stopped the truck and ordered Johnson out. The white van turned southbound onto Western, but immediately made a U-turn and headed towards the freeway.

From the helicopter, Officer Camporredondo saw the white van on Slauson, travelling at a speed of 35 to 45 miles per hour. A box fell from the top of the van onto the street. Officers stopped the van at Slauson and Figueroa. Sergeant Steven Reyes recovered the box and transported it to the crime scene.

(ii) *The investigation*

Shortly after police stopped the truck, they transported Jarrett to Slauson and Figueroa, where the white van was stopped. The officers showed Jarrett the box, which he identified as being one of the printers from his cargo. The box was unopened and undamaged. Jarrett identified the van and Davis as the driver.

The van was searched one or two days after the incident at the police garage. It contained, among other things, walkie talkies, a lug wrench, a jack, a bolt cutter capable of cutting heavy duty padlocks, and a pair of gloves. As to the truck, the ignition had been removed and one of the cab's windows was broken. The trailer's padlocks were missing and the shrink wrap had been removed from one of the pallets. That pallet was missing a box.

(iii) *Expert testimony*

L.A.P.D. Detective Marc Zavala, the investigating officer and an expert in commercial vehicle and cargo thefts, testified as follows. A "follow car" is sometimes used in cargo thefts to transport the perpetrators to the target vehicle, trail the stolen truck, scout the area, and act as a lookout. Persons in a follow car will alert the thieves if police are in the area or if someone appears to be watching them. Thieves typically remove a sample of the cargo and place it in another vehicle, allowing them to assess the cargo and immediately begin soliciting potential buyers. When presented with a hypothetical based on the evidence presented in the case, Zavala opined that the white van was a follow car for the stolen truck. Zavala's opinion was based on the "mean look" Davis gave Jarrett, the fact the incident occurred in the early hours of the morning, and the fact a box from the stolen truck was found in the van.

b. *Defense evidence*

As relevant here, the defense primarily sought to establish that the prosecution witnesses' testimony regarding the box that fell from the van was contradictory.

2. *Procedure*

Trial was by jury. Davis was convicted of grand theft of the truck (count 1, Pen. Code, § 487, subd. (d)(1));[2] grand theft of personal property, the Hyundai trailer (count 2, § 484, subd. (a)); and grand theft of the trailer's cargo, the printers (count 3,

---

[2] All further undesignated statutory references are to the Penal Code.

§ 487h, subd. (a)).**3** The jury additionally found Davis took property valued at over $65,000 (§ 12022.6, subd. (a)(1).)**4** In a bifurcated proceeding, the trial court found Davis had suffered a prior "strike" conviction for first degree burglary in 1994. It denied Davis's motion to strike a prior conviction allegation pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 and sentenced him to seven years in prison, consisting of the upper term of three years on count 1, doubled to six years pursuant to the "Three Strikes" law, plus one year for the property value enhancement. The court stayed sentence on the other two counts pursuant to section 654. It imposed a restitution fine, a suspended parole restitution fine, a court operations assessment, a criminal conviction assessment, and a crime prevention fee. Davis appeals.

DISCUSSION

1. *The evidence was sufficient to prove Davis was an aider and abettor.*

Davis contends the evidence was insufficient to prove he acted as an aider and abettor to the thefts. He avers there is no evidence he worked in concert with or provided assistance to Johnson, and no witness "testified as to any affirmative act" he undertook to assist in the crimes. We disagree.

When determining whether the evidence was sufficient to sustain a criminal conviction, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66; *People v. Houston* (2012) 54 Cal.4th 1186, 1215.) We presume in

---

**3** Davis was originally charged with three additional counts of receiving stolen property. Upon the People's motion, these counts were dismissed pursuant to section 1118.1

**4** The verdict form contains a typographical error. It states the jury found Davis stole property of a value exceeding $65,000 within the meaning of section 12022.6, subdivision (a)(2). The proper subdivision was (a)(1). The information and the abstract of judgment contain the correct subdivision.

5

support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Brown* (2014) 59 Cal.4th 86, 106.)

A person aids and abets when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates its commission. (*People v. Smith* (2014) 60 Cal.4th 603, 611; *People v. Delgado* (2013) 56 Cal.4th 480, 486.) Among the factors that may be taken into account are presence at the crime scene, companionship, and conduct before and after the offense. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5; *People v. Battle* (2011) 198 Cal.App.4th 50, 84-85.) Mere presence at the scene of a crime, knowledge of the perpetrator's criminal purpose, or the failure to prevent the crime do not amount to aiding and abetting, although these factors may be taken into account in determining criminal responsibility. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 272-273; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530.) " 'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *In re Juan G.*, at p. 5.)

The evidence here was sufficient to establish that Davis not only knew about and intended to facilitate the theft, but took active steps to aid in its commission. Davis, driving the white van, pulled out onto the road at the same time the stolen truck did. The van briefly followed the truck, which was initially travelling at approximately three miles per hour. There was no other traffic in the area, and nothing prevented the van from passing the truck on the multi-lane street. This evidence suggested the van and truck were travelling together.

6

When Jarrett began to follow the truck, Davis followed him. Davis gave Jarrett a "mean" or intimidating look, causing Jarrett to temporarily break off his pursuit of the truck. According to Jarrett, "the guys in the white van kept looking at me and [were] really paying a lot of attention to me." Detective Zavala, testifying as an expert, explained that thieves sometimes use a "follow car" to act as a lookout. Davis's conduct was consistent with that role. We do not agree with Davis's characterization of Zavala's testimony as "speculative." Furthermore, the box missing from the truck's cargo was seen falling from the van Davis was driving. This fact provided compelling evidence that Davis was actively assisting with the thefts. The circumstances fit the pattern described by Zavala, namely, that thieves typically remove a sample from a cargo haul to assess the contents and enable them to immediately begin contacting potential buyers.

Police found bolt cutters and walkie talkies in the van, suggesting Davis provided or controlled the tools used to cut the padlocks and communicated with Johnson as he drove the truck away. Jarrett's testimony that the truck turned on Slauson at the last minute suggests Davis told Johnson he was being followed. When the truck encountered the patrol cars, Davis turned and headed in the opposite direction, further suggesting he was indeed part of the heist team. The absence of a license plate on the van suggested the thieves had removed it to avoid detection and ensure a clean getaway. In short, there was ample evidence from which the jury could reasonably have concluded Davis was part of the team carrying out the heist, and aided and abetted the thefts. This evidence showed active participation in the crime, not mere presence at the scene or the receipt of stolen property.

Davis urges the foregoing evidence was insufficient. He contends that the phone, gloves, and bolt cutters are commonplace items one would expect to find in a work van, and there was no evidence they were actually used in the theft. He argues that the evidence connecting the box to the white van was highly contradictory. Jarrett testified that police showed him the box that fell from the van at Slauson and Figueroa. The box was in the back of the van, and the officers took it out of the van so he could identify it. Sergeant Vach, on the other hand, testified that officers showed the box to Jarrett on

7

Western, where the big rig was stopped; they placed it on top of the police car hood or trunk.  Detective Zavala, who was not present on the night of the theft, testified that Jarrett told him police returned the box to him the night of the incident.  Zavala, however, testified at the preliminary hearing that he, Zavala, saw the box in the van.  At trial, Zavala hypothesized that he probably saw a photograph of the box in the van, not the box itself.  Furthermore, it was undisputed the box was not damaged, a fact Davis contends is remarkable if, in fact, the box fell from the van while it was travelling at the speed estimated by the helicopter pilot, 35 – 45 miles per hour.

Davis is correct that the evidence regarding the box was contradictory.  However, he misapprehends our role in reviewing the record for substantial evidence.  (*People v. Whitmer* (2014) 230 Cal.App.4th 906, 924.)  "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  " ' " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' " (*People v. Jackson* (2014) 58 Cal.4th 724, 749; *People v. Cortes* (1999) 71 Cal.App.4th 62, 81 [where an appellant "merely reargues the evidence in a way more appropriate for trial than for appeal," we are bound by the trier of fact's determination].)  The evidence was sufficient.

2. *Conviction of multiple theft-related counts*

Davis was convicted of three offenses arising from the single incident:  grand theft of Jarrett's truck (§ 487, subd. (d)(1)), grand theft of BK Freightliner's Hyundai trailer (§ 484, subd. (a)), and grand theft of cargo, the Cricut Starter Kits belonging to Provocraft (§ 487h, subd. (a)).  Sentence on the latter two counts was stayed pursuant to section 654.  Davis contends two of the convictions should be reversed as improper multiple convictions for the same offense.  We agree that two of the convictions cannot stand, but rather than reversing counts 2 and 3, we order the three counts consolidated into a single count.

Under section 954,**5** a defendant generally may be convicted of more than one crime arising out of the same act or course of conduct, unless one is a necessarily included offense of the other. (*People v. Reed* (2006) 38 Cal.4th 1224, 1226; *People v. Ortega* (1998) 19 Cal.4th 686, 692, disapproved on other grounds in *People v. Reed, supra,* at p. 1228.) Our Supreme Court has "repeatedly held that the same act can support multiple charges and multiple convictions. 'Unless one offense is necessarily included in the other [citation], multiple convictions can be based upon a single criminal act or an indivisible course of criminal conduct (§ 954).' " (*People v. Gonzalez* (2014) 60 Cal.4th 533, 537; *People v. Reed, supra,* at pp. 1226-1227; *People v. Benavides* (2005) 35 Cal.4th 69, 97.) Pursuant to section 654, however, a defendant may not be *punished* more than once for the same criminal act or for a series of acts committed incident to one objective. (§ 654, subd. (a); *People v. Reed, supra,* at p. 1227.)

   a. *People v. Whitmer and the Bailey doctrine*

   Davis contends that *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*), as clarified by *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*), requires that two of his convictions be reversed. In *Bailey*, a defendant made a single misrepresentation that enabled her to obtain a series of fraudulent welfare benefits. Each payment was less than the threshold amount for grand theft, but the aggregated total exceeded it. (*Bailey*, at p. 518.) "*Bailey* held that the People could charge a defendant's ongoing receipt of welfare benefits arising from a single fraudulent application as a single grand theft rather than as discrete, separate petty thefts because the thefts were all committed 'pursuant to one intention, one general impulse, and one plan.' [Citation.]" (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1517.) Thereafter, some courts held that *Bailey* not only allowed such aggregation,

<hr>

**5**      Section 954 provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged . . . ."

but barred multiple convictions for grand theft when the individual thefts arose from a single plan or scheme, even though each theft was separate and distinct and involved property exceeding the amount needed to establish grand theft. (*Whitmer, supra,* at p. 739; *People v. Kirvin, supra,* at p. 1517.)

In *Whitmer,* our Supreme Court held that the latter cases had misinterpreted *Bailey,* and "jettisoned much of this earlier precedent by holding that a defendant could sustain multiple convictions 'based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme.' " (*People v. Kirvin, supra,* 231 Cal.App.4th at p. 1518; *Whitmer, supra,* 59 Cal.4th at pp. 740–741.) In *Whitmer*, the manager of a motorcycle dealership arranged for the fraudulent sales of vehicles to fictitious buyers. Most transactions involved a different vehicle and different fictitious buyers, and took place on different dates. (*Whitmer, supra,* at pp. 735-736.) Relying on *Bailey,* the defendant argued he could be convicted of but one theft because the crimes were part of a single scheme. (*Whitmer, supra,* at p. 736.) Reasoning that "each count of grand theft was based on a separate and distinct act," (*id.* at p. 736), our Supreme Court concluded a thief should not receive a " ' "felony discount" ' " if the thefts are separate and distinct even if they are similar. . . . [A] defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Id.* at pp. 740-741.) *Whitmer* did not overrule *Bailey,* but explained the "*Bailey* rule must be interpreted in light of its facts." (*Whitmer,* at p. 740.) But, because a "long, uninterrupted series of Court of Appeal cases . . . [had] consistently held that multiple acts of grand theft pursuant to a single scheme cannot support more than one count of grand theft," *Whitmer's* holding cannot be applied retroactively. (*Id.* at p. 742; *People v. Kirvin, supra,* at p. 1518.)

Davis's crimes were committed in 2008, before *Whitmer* was decided; therefore, the pre-*Whitmer* interpretation of *Bailey* applies. (*Whitmer, supra,* 59 Cal.4th at p. 742.) Under that interpretation, the motorcycle thief in *Whitmer* "could only have been convicted of a single count of grand theft" for the series of fraudulent sales. (*Id.* at p. 735.) Davis argues that under *Bailey,* he can be convicted but once for the three thefts,

because they were undertaken pursuant to a single plan and scheme. He reasons that if a defendant could not be convicted of multiple counts of theft arising from multiple separate transactions occurring over a period of time, logically he cannot be convicted of multiple counts of theft for taking multiple items during a single incident. (See *People v. Gardner* (1979) 90 Cal.App.3d 42, 45-46 [defendant shot five hogs, belonging to a single owner, killing them with a single volley, and stole their carcasses; the series of thefts was carried out with a single purpose and plan, occurred during a single transaction, and constituted a single offense].) We agree that under *Bailey,* if the theft of the truck, the trailer, and the cargo are considered a series of takings, they were carried out pursuant to only one plan and scheme, and were therefore a single theft.[6] (*Whitmer, supra,* at p. 742 [under the former interpretation of *Bailey,* there can only be one grand theft if multiple acts of grand theft are pursuant to a single intention and plan].)

However, application of *Bailey* is uncertain here. As noted, the property at issue belonged to three different persons or entities. The appellate courts have disagreed about whether *Bailey* applies in the case of multiple victims. (See, e.g., *In re David D.* (1997) 52 Cal.App.4th 304, 310 ["one limitation of the *Bailey* doctrine is its inapplicability to offenses involving multiple victims"]; *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1149 [*Bailey* has generally been limited to thefts involving a single victim]; *People v.*

---

[6] The People argue that Davis committed separate and distinct acts of theft within the meaning of *Bailey* because, in order to steal the big rig, he (or his accomplices) engaged in the "separate and distinct acts" of cutting the lock, removing the shrink wrap from the pallets, removing one of the printer boxes, and driving the truck away. These actions are simply not the equivalent of the separate acts at issue in the motorcycle theft scheme in *Whitmer.* (See *Whitmer, supra,* 59 Cal.4th at p. 739 [and cases discussed therein]; *People v. Gardner, supra,* 90 Cal.App.3d at p. 48.) Davis aided and abetted the theft of a single big rig, comprised of a connected truck and trailer, which contained cargo. The rig was driven off in one single event. The fact the thieves removed one printer box during the same incident does not give rise to a separate theft. In any event, *Whitmer* does not apply retroactively to Davis, and under the pre-*Whitmer* application of *Bailey,* a series of separate thefts that were part of a single scheme resulted in only one conviction.

11

*Garcia* (1990) 224 Cal.App.3d 297, 308; *People v. Brooks* (1985) 166 Cal.App.3d 24, 31 [applying *Bailey* to multiple thefts from a single fund to which multiple victims had contributed], disapproved on another point in *Whitmer, supra,* 59 Cal.4th at pp. 739-740; *In re Arthur V.* (2008) 166 Cal.App.4th 61, 68-69 & fn. 4 [in a vandalism case, the existence of multiple victims does not necessarily preclude aggregation under *Bailey*]; *People v. Carrasco* (2012) 209 Cal.App.4th 715, 717 [where a defendant commits multiple acts of vandalism pursuant to a single plan, the fact the damaged property is owned by more than one victim does not preclude aggregation resulting in an offense of felony vandalism].)  Accordingly, we turn to defendant's other arguments.[7]

     b.  *The single larceny rule*

Even assuming arguendo that *Bailey* does not apply, *People v. Smith* (1945) 26 Cal.2d 854 compels the conclusion that Davis could not properly be convicted three times based on the single theft of the big rig, even though he and his compatriots took the property of three victims.  There is no dispute that when a defendant steals multiple items during the course of an indivisible transaction involving a *single* victim, he commits only one theft notwithstanding the number of items he steals.  (*People v. Ortega, supra,* 19 Cal.4th at p. 699; *People v. La Stelley* (1999) 72 Cal.App.4th 1396, 1400; *People v. Brito* (1991) 232 Cal.App.3d 316, 326, fn. 8.)  Similarly, over 60 years ago our Supreme Court explained that a defendant who steals items belonging to *multiple victims* in a single incident commits only a single theft.  (*People v. Smith,* at p. 859.)  This principle is sometimes known as the "single larceny doctrine."  (*People v. Marquez* (2000) 78 Cal.App.4th 1302, 1308.)[8]

---

**7**    At oral argument, we invited the parties to submit further briefing on the significance of the fact that the property taken belonged to multiple victims, and that the crimes were charged pursuant to different statutes.

**8**    Of course, the rule is different when the offense is robbery. "Since the central element of robbery is force or fear, a defendant may be convicted of a separate robbery for each victim of such force or fear, even if the victims are in joint possession of the

12

In *Smith,* the defendant was convicted of three counts of receiving stolen property, based on his receipt of three stolen car radios. *Smith* held that his simultaneous receipt of several articles of stolen goods supported only one conviction, even though the articles may have been previously stolen from several different owners. (*People v. Smith, supra,* 26 Cal.2d at pp. 858-859.) The court observed that "[n]either the legal nor moral character of the act is affected in any way by the fact that the stolen property may have belonged to several persons rather than to a single person." (*Id.* at p. 859.) In support of its holding, the court reasoned "by analogy in the authorities dealing with the crime of larceny, which authorities hold that the theft of several articles at one and the same time constitutes but one offense although such articles belong to several different owners." (*Ibid.*)

*People v. Bauer* (1969) 1 Cal.3d 368, reiterated *Smith*'s approval of the doctrine in dicta. There, the defendant was convicted of burglary, robbery, grand theft, and automobile theft after he and a cohort entered the home of three elderly women under false pretenses, restrained them, took personal property belonging to each of them, and drove away in a car belonging to one of them. (*Id.* at p. 372.) On appeal, the defendant urged section 654 precluded punishment for both the robbery and the auto theft, and the court agreed. (*Bauer*, at p. 378.) *Bauer* reasoned that "where a defendant robs his victim in one continuous transaction of several items of property, punishment for robbery on the basis of the taking of one of the items and other crimes on the basis of the taking of the other items is not permissible." (*Id.* at p. 377.) Section 654 precludes double punishment when an indivisible course of conduct violates more than one statute; thus, the "taking of several items during the course of a robbery may not be used to furnish the basis for separate sentences." (*Bauer,* at pp. 376-377.)

The Attorney General argued in *Bauer* that multiple punishment was permissible because there was more than one victim. (*People v. Bauer, supra,* 1 Cal.3d at p. 377.)

property taken." (*People v. Marquez, supra,* 78 Cal.App.4th at p. 1308; *People v. Bonner* (2000) 80 Cal.App.4th 759, 763-764.)

*Bauer* reasoned that although multiple punishment was permissible where crimes of violence were committed against different persons, the same was not true when the crimes were against the property interests of several persons. (*Id.* at pp. 377-378.) Although multiple punishment, not multiple conviction, was at issue in *Bauer,* citing *Smith* the *Bauer* court stated: "this court has pointed out that the theft of several articles at the same time constitutes *but one offense* although such articles belong to several different owners. [Citations.] This view has been followed '[i]n the vast majority of cases' where it has arisen or been discussed. [Citation.] If the rule were otherwise a burglar who entered an empty house and took numerous articles belonging to one person could be punished for only one offense, but if some of the articles belonged to each of the other members of the family, the burglar could be given consecutive sentences for as many offenses as there are members of the family. The situation would be even more anomalous where stolen property was owned jointly or by a partnership." (*Bauer,* at p. 378, italics added.) Because the crimes were committed in the course of an indivisible transaction, section 654 precluded double punishment. (*Bauer,* at pp. 375-378.)

The single larceny principle articulated in *Smith* and *Bauer* has been echoed by subsequent courts. *People v. Marquez, supra,* 78 Cal.App.4th at pp. 1308-1309, reiterated that "when property properly belonging to different persons is taken at the same time and place, only one larceny will lie for the taking." There, the defendant robbed a restaurant employee of her tips, as well as the restaurant's money from the cash drawer in the same incident and, based on the separate ownership of the two amounts of money taken, was convicted of two counts of robbery. (*Id.* at pp. 1304-1305, 1307.) Citing *Smith,* the court held that "when a defendant steals by force or fear more than one item during the course of an indivisible transaction involving a single victim, he commits only one robbery notwithstanding the number and ownership of the items he steals." (*Marquez,* at pp. 1304, 1308.) The offense was comprised of an "indivisible transaction involving a single victim who was forced to relinquish possession of two separately owned amounts of money at the same place and at the same time." (*Id.* at p. 1307.) Thus, only one robbery conviction was proper. "To hold otherwise would violate the

14

hoary single larceny doctrine which has long been followed in the majority of cases wherein the issue of single or multiple larcenies has arisen . . . ." (*Id.* at p. 1308; see also *People v. Mitchell* (2008) 164 Cal.App.4th 442, 461-462; *People v. Gardner, supra,* 90 Cal.App.3d at p. 47; cf. *People v. Dominguez* (1995) 38 Cal.App.4th 410, 420 [citing, in connection with a § 654 analysis, the "long-standing rule" that the " 'theft of several articles at one same time constitutes but one offense [even where] such articles belong to several different owners' "]; *People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113-1114 [same].)

Consistently with the foregoing, our Supreme Court has also held, outside the context of theft offenses, that a "defendant may properly be convicted of multiple counts for multiple victims of a single criminal act only where the act prohibited by the statute is centrally an 'act of violence against the person.' " (*Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 351, superseded by statute on other grounds as stated in *People v. Arndt* (1999) 76 Cal.App.4th 387, 393-394.) In *Wilkoff,* the defendant drove under the influence, killing one victim and injuring five others. (*Wilkoff v. Superior Court,* at p. 347.) She was charged with 12 counts in addition to vehicular manslaughter: one count of driving under the influence in violation of Vehicle Code section 23153, subdivision (a), and one count of driving with a blood alcohol level above 0.10 in violation of former subdivision (b) of the same statute, for each of the six victims. She moved to dismiss 10 of the counts, arguing that only one count of each subdivision could arise from a single incident of driving under the influence. (*Wilkoff v. Superior Court,* at p. 348.) *Wilkoff* agreed. The court reasoned that "a charge of multiple counts of violating a statute is appropriate only where the actus reus prohibited by the statute – the gravamen of the offense – has been committed more than once." (*Id.* at p. 349.) The act prohibited by Vehicle Code section 23153 was defined "in terms of an act of driving." (*Wilkoff v. Superior Court,* at p. 352.) "Defendants are not chargeable with a greater *number* of offenses simply because the injuries proximately caused by their single offense are greater. Rather, the Legislature may provide for increased *punishment* for an offense that has more serious consequences by, for instance, raising the statutory prison

15

terms, adding enhancements, or upgrading the offense from a misdemeanor to a felony."
(*Ibid.*; see also *People v. Garcia* (2003) 107 Cal.App.4th 1159, 1163 [defendant could only be convicted of one count of felony evading an officer, not one count for each officer who followed him in a single pursuit].)

The central element of theft is taking. (See *People v. Neder* (1971) 16 Cal.App.3d 846, 852 ["The essential act in all types of theft is taking"].) Theft is a property crime, not a crime of violence. (*People v. Bauer, supra,* 1 Cal.3d at p. 378 ["The crime of automobile theft is not a crime of violence but is a violation of property interests"].) The gravamen of the offense was committed only once here, when the thieves stole the big rig and its contents. Given the foregoing authorities, we agree that Davis could not properly be convicted of three theft-related counts based on his aiding and abetting the single theft of the tractor-trailer.

The People urge that *Smith* and *Bauer* have no application here. They point out, correctly, that the offense at issue in *Smith* was receipt of stolen property, not theft, and the issue in *Bauer* (and some of the cases quoting it) was whether multiple punishment was permissible under section 654, not the related but distinct question of whether multiple convictions were proper under section 954. They also point out that the cases that quote *Smith* do not involve the circumstances here, or the offense of theft.[9] To these observations, we add that *Smith* did not discuss how the single larceny doctrine meshed

---

[9]     Citing *People v. Gomez* (1992) 2 Cal.App.4th 819, disapproved on other grounds in *People v. Lewis* (2008) 43 Cal.4th 415, 519, footnote 29, Davis incorrectly avers that this court has "applied the 'single larceny rule' to bar multiple convictions." Our decision in *Gomez* was based not on the single larceny rule, but on the fact theft was a lesser included offense of robbery, and the crimes occurred in a continous transaction. (*People v. Gomez, supra,* at p. 826.) The same is true of several other cases cited by Davis. (*People v. Gamble* (1994) 22 Cal.App.4th 446, 450; *People v. Irvin* (1991) 230 Cal.App.3d 180, 184.) Davis argues that grand theft is a lesser included offense of cargo theft, but *People v. Ortega, supra,* 19 Cal.4th 686, suggests it is error to treat "every form of theft as a separate offense." (*Id.* at p. 696.) In any event, Davis was not convicted under two statutes for the cargo theft; instead the issue is whether the theft of each item was properly treated as a separate offense.

with section 954, or explain whether it constituted an exception to the principle that a defendant can be convicted of multiple offenses arising from a single act. *Smith* did not rely upon California law for the single larceny principle, but instead cited a treatise and an Iowa case. (*People v. Smith, supra,* 26 Cal.2d at p. 859.) Moreover, the rule as articulated in *Smith* has not been elaborated upon in the more than 60 years since the case was decided.

But these circumstances do not mean we are free to disregard *Smith. Smith*'s discussion of the single larceny principle was an essential part of its reasoning. Although *Bauer*'s reference to *Smith* was dictum, the court's discussion appears to indicate approval of the single larceny rule. As stated in *People v. Gardner:* "While the cases [including Bauer] fail to adequately distinguish between the concept of a single act or omission in the context of multiple prosecution and conviction as opposed to multiple punishment [citations], nonetheless the principle distilled unerringly indicates that in the crime of larceny the simultaneous theft of several items of property, even from multiple owners, constitutes but a single offense. [Citation.]" (*People v. Gardner, supra,* 90 Cal.App.3d at p. 47; see also *People v. Valencia* (2011) 201 Cal.App.4th 922, 930-931 [even dictum from our Supreme Court is considered persuasive].) The People point to no case in which the Supreme Court has repudiated its approval of the principle articulated in *Smith,* and we are aware of none. We are therefore not free to disregard *Smith*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Nor do the People offer any persuasive basis for a contrary conclusion. Thus, on the facts presented here, *Smith's* single larceny rule operates as an exception to section 954's rule that multiple offenses may arise from a single act.

*People v. Philpot* (2004) 122 Cal.App.4th 893, does not suggest a different result. In *Philpot,* the defendant stole a landscaping truck with an attached utility trailer that contained equipment. He was convicted, inter alia, of two counts of unlawfully driving or taking a vehicle (Veh. Code, § 10851, subd. (a)): one count for the trailer, and one count for the truck. (*Philpot,* at pp. 899-900.) He contended his conviction for taking the trailer should be reversed, apparently on the theory that the truck and trailer constituted

but a single motor vehicle. *Philpot* distinguished authorities holding that when hitched together, a truck/tractor and a trailer are one motor vehicle. (*Id.* at pp. 901-903.) The court agreed with the People that because a trailer was a vehicle, and Vehicle Code section 10851 punished the unlawful driving or taking of a " 'vehicle' " rather than a " 'motor vehicle,' " both convictions were proper. (*Philpot,* at pp. 899-900.) In a footnote, *Philpot* reasoned in dicta that if the truck and trailer had been owned by different persons, "public policy would mandate that a defendant should be convicted of two counts of unlawfully taking a vehicle." (*Id.* at p. 904, fn. 4.) The court also "presume[d]" that the defendant would not have challenged his conviction for the second vehicle taking count had he stolen a tow truck with an attached motor vehicle, or driven a big rig truck carrying multiple vehicles. (*Ibid.*) But *Philpot* addressed Vehicle Code section 10851, not the theft statutes at issue here. Moreover, it did not consider the single larceny rule, section 954, or *Smith,* nor did the court cite authority for its public policy discussion. Because cases are not authority for propositions not considered (*People v. Brown* (2012) 54 Cal.4th 314, 330), *Philpot* is not determinative on the issue presented here.[10]

      c. *Counts 2 and 3 should be consolidated with count 1, rather than reversed.*

Davis argues that we should reverse his convictions on counts 1 and 3. *People v. Soria* (2015) 239 Cal.App.4th 123, recently employed a different remedy for duplicative convictions, which we adopt here. In *Soria,* the defendant was convicted of two counts of violating two subdivisions of section 261: rape by an intoxicated person and rape of an unconscious person. (*People v. Soria, supra,* at p. 125.) *Soria* explained that although rape is a unitary offense, violations of different subdivsions may have distinct penal consequences, making it inappropriate to strike counts; striking a count may have

---

[10]    In light of our resolution of this issue, we need not reach the question of whether cargo theft (§ 487h) is a different offense than grand theft, or simply a different statement of the same offense of theft. (See generally *People v. Gonzalez, supra,* 60 Cal.4th at p. 537; *People v. White* (2015) 237 Cal.App.4th 1087, 1104; *People v. Toure* (2015) 232 Cal.App.4th 1096, 1105-1106; *People v. Coyle* (2009) 178 Cal.App.4th 209, 217.)

unintended consequences if a particular count is later reversed for reasons specific to it; and it is unclear how a court should choose which count to strike. (*Id.* at pp. 144-146.) Accordingly, *Soria* applied a procedure used by our Supreme Court in an earlier case, namely, modifying the judgment by consolidating the two counts into a conviction for a single count of rape reflecting violations of both subdivisions. (*Id.* at p. 146; see also *People v. Coyle, supra,* 178 Cal.App.4th at pp. 217-218 [consolidating duplicative murder convictions into a single count].)

We believe this is the appropriate approach here, especially as to count 3. Section 487h was enacted in 2004. (Stats. 2004, ch. 515, §1.) The legislative history of section 487h indicates that the purpose of the statute was to "separately define[ ] the crime of cargo theft, in order to track the number of cases where the property taken fits this category." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1814 (2003-2004 Reg. Sess.) as amended Aug. 10, 2004, p. 1.) Such tracking was intended to facilitate the capture of federal funding available for purposes of port security. (Assem. Com. on Public Safety, Analysis of Assem. Bill 1814 (2003-2004 Reg. Sess.) as amended March 11, 2004, p. 3.) Thus, modifying the judgment to consolidate the counts into a single judgment will better effectuate the legislative intent.

3. *Faretta claims*

a. *Additional facts*

(i) *Pretrial proceedings*

On March 21, 2013, at a pretrial conference, Davis stated that he wanted to "withdraw from counsel." He complained he was "being held unlawfully" because the case had been improperly dismissed and refiled. He also argued the case had been refiled in retaliation for a complaint he had made against the district attorney's office between the dismissal and the refilling. The trial court stated that it would address Davis's request on the next court date.

On April 5, 2013, defense counsel, Attorney Abukurah, informed the court that Davis wanted a *Marsden* hearing. Davis complained that his case had been dismissed and improperly refiled under a different case number. In Davis's view, this circumstance

19

barred further prosecution, but counsel had failed to pursue the issue. The trial court explained that the People were allowed to refile cases. It found that to the extent any procedural issue might exist, defense counsel appeared aware of the issues, and denied the *Marsden* request. When the prosecutor returned to the courtroom, she clarified the procedural posture of the case.[11]

On April 8, 2013, Davis made another *Marsden* motion, based primarily on his concerns about the refiling of the case. Defense counsel stated that in his opinion, there was no legal basis to challenge the refiling. The court denied the *Marsden* motion. When proceedings resumed, appointed counsel requested a continuance so he could investigate a potential defense. Davis refused to waive time and stated he would hire private counsel. The trial court stated Davis could do so, but would need additional time. Davis stated he wished to proceed to trial and would cross-examine his own witnesses. When the trial court pointed out that Davis was represented by counsel, Davis asked, "Can't I be a co-counsel?" The court replied: "Generally speaking that involvement of a client in his or her defense is something worked out between counsel, him and herself. Generally not. Look, you need one captain for this ship, somebody that knows the law, somebody that knows evidence, somebody that knows his or her way around the jury and that's your current counsel." The court granted the continuance over Davis's objection.

---

[11]     The prosecutor explained the matter was originally filed under case No. BA347461, but the People were unable to proceed because they had lost touch with the victim. The  matter was refiled under a different case number, BA370192. A section 995 motion was heard and denied, and trial was set for September 3, 2010. Davis, however, failed to appear for trial and a warrant was issued for his arrest. Before the instant case was refiled, Davis was charged in an unrelated three-defendant case with receiving stolen property; that case was dismissed when police declined to disclose the identity of an informant. Additionally, a separate preliminary hearing and jury trial were held for another defendant in regard to the Jarrett thefts. The prosecutor believed Davis was confusing the cases.

20

On May 17, 2013, shortly before jury selection commenced, Davis again expressed frustration about the refiling. The trial court again explained that the People had discretion to dismiss and refile.

(ii) *May 20, 2013 proceedings*

After the jury was impaneled, on May 20, 2013, Davis stated he wanted to represent himself unless the court appointed different counsel. The trial court conducted a third *Marsden* hearing, at which Davis reiterated his complaints about the refiling issue. After the court denied the motion, Davis stated he wished to represent himself. The trial court said Davis could represent himself if he was ready to proceed. Davis asked for a continuance to obtain preliminary hearing transcripts. The court explained, "You either have to say yes, you're ready, and you go with what you have, or, no, you're not ready, and [appointed counsel] represents you. That's your choice." Davis affirmed he was ready to proceed.

The court advised Davis of the perils of self-representation. It also stressed that if he failed to follow the court's orders his *Faretta* right would be revoked. Davis asked the prosecutor for authority that allowed the People to refile the case. The trial court reiterated that the People had a right to refile and ordered Davis to drop the issue. The court ordered Davis not to raise the refiling issue before the jury. The court explained: "You don't bring it up in front of the jury. . . . That's a legal decision by the court. If you don't follow my rules, then – and the rules of evidence and you continue to bring it up in front of the jury, then I will have to revoke your pro per status." Davis nonetheless continued to express the view that the refiling was illegal.

The trial court moved to an explanation of opening statements. Davis returned to the refiling issue, stating: "You destroying my argument when you tell me I can't raise that the District Attorney's Office – because I have a complaint against the District Attorney's Office – that this has been a retaliation due to a complaint, and they took the case that was dismissed pursuant to Penal Code 1382, and they didn't refile it, but put it up under another case number." The trial court once again reiterated that the issue was not one for the jury, and that if Davis violated the rules, it would revoke his right to self-

21

representation. Davis then stated: "Well, Your Honor, I might as well let him go on and do the case then. I can't say anything. You not giving me no option." He also complained that he had only 10 minutes to prepare. The following discussion transpired:

"[The Court:] Do you want to represent yourself? You have the same rules that all lawyers have. Now what do you want to do? Represent yourself or have Mr. Abukurah do it?

"[Davis]: I want to be a co-counsel.

"The Court: You're not going to be co-counsel. It's one or the other.

"[Davis]: You're not giving me enough time to prepare.

"The Court: Just tell me, do you want to represent yourself or not?

"[Davis]: Yes, I want to represent myself, but you're not giving me no time.

"The Court: We're going around in circles.

"[Davis]: I just told you.

[¶] . . . [¶]

"The Court: All right. Now, it sounds to me like you want Mr. Abukurah to do the case, because you're not ready.

"[Davis]: Of course I am not ready. I just did my [*Faretta*] rights. Everywhere I went, from pre-trial to trial, I have not had --

"The Court: We're going in circles. I am bringing the jury in. I am going to instruct the jury. [The prosecutor] is going to make an opening statement, and I am going to turn, and I want to know who is making the opening statement, you or Mr. Abukurah?

"[Davis]: He can make the opening statements, but I want to cross-examine my witness.

"[The Court]: You're not cross-examining the witnesses, all right? Let's bring the jury in. Mr. Abukurah, you're counsel.

[¶] . . . [¶]

"[Davis]: I want to request private counsel.

"The Court: Denied."

22

(iii) *May 21, 2013 Faretta request and subsequent revocation*

During trial, Davis asserted his *Faretta* rights. The trial court granted his request, appointed defense counsel as stand-by counsel, and reminded Davis to behave professionally, follow the rules, and not raise the refiling issue. The court admonished: "If you bring up the refile, you're disregarding a court order and not going to represent yourself anymore, all right?" Davis responded, "Yeah, I understand that, Your Honor. But why is that so confidential? I mean, I might have an argument that's leading that way." The court reminded Davis that it had already "ruled on that several times." Davis again expressed his opinion that the case was improperly refiled. The court advised "That's not for the jury. If you bring that up, Mr. Abukurah is going to step right back, okay? I have ruled that's inadmissible." Davis accused the judge of "being protective of" and "scared of" the issue. The court told Davis it would not entertain further argument on the issue and Davis was required to follow the rules. Trial resumed, with Davis representing himself.

During cross-examination, Davis asked whether Officer Camporredondo was aware Davis had made a complaint against the district attorney's office "for tampering" with a tape. Camporredondo said he was unaware of the allegation.

During cross-examination of Sergeant Reyes, Davis asked, "Is you aware that I have a complaint against your agency, 77th Police Agency, about this matter?" Reyes responded affirmatively. Davis then asked, "And that's why you're here testifying today; correct?" The trial court sustained the prosecutor's relevance objection. Davis asked: "You do know that after this case was dismissed, I filed--" The prosecutor objected, and the court stated: "I told you we're not supposed to talk about that. I've said it several times. That's not an issue." Davis averred that he was "just trying to get to the question." The trial court said, "No. If you want to represent yourself, you have to follow the rules. I made that statement quite clearly. Don't bring in extraneous matters."

During cross-examination of Detective Zavala, Davis again asked about the refilling issue, querying: "Well, this case was dismissed; correct?" When the prosecutor objected, Davis insisted that he had to "talk about this part to get to where I'm trying to

23

get to." The trial court stated, "No. I told you not to ask that." The court observed Davis kept "asking questions about things I told you not to ask about. You keep trying to slip it in." Davis responded that he had a right to due process, and the court was "not giving me a fair trial. You covering up information." The court allowed Davis to elicit that Zavala had testified at Johnson's trial. When Davis stated, "Your name is nowhere in the transcript," the court excused the jurors.

When the jury was excused for the lunch break, the court stated it intended to revoke Davis's pro per status in light of the fact Davis had asked about the dismissal despite the court's instructions. Davis replied that he had not understood he was prohibited from mentioning a "dismissal" as opposed to a "refiling." He explained: "You didn't say 'dismissed.' " He averred he was only asking about the dismissal to "get to the point about the complaint I filed." When the afternoon session resumed, the court revoked Davis's right to self-representation, explaining: "I've reviewed the transcript. I told you many times before. You were even representing yourself that that dismissal was irrelevant. I told it to you of course before the witnesses took the stand. You also kept asking about the complaints, which I said the grounds were not important. You could raise the fact that there was a complaint, but here I see on two occasions you raised the issue of a dismissal." After detailing Davis's attempts to raise the refiling issue and the court's repeated directives on the subject, the court observed, "You are clearly trying to get that in front of the jury to taint the trial, and I don't believe there is anything I can do to prevent you from doing this because you clearly will not follow the court's rules." Davis assured the court he would not "say the word 'dismissed' again." Over Davis's objection, the court ruled, "since you refuse to follow the court's instructions, I am revoking your pro per privileges and Mr. Abukurah will be representing you."

24

(iv) *Subsequent Faretta proceedings*

Trial resumed.  Davis twice requested self-representation, but the trial court declined to revisit its ruling.  After the verdicts and a court trial on the prior conviction allegation, Davis again represented himself.  Eventually, at sentencing, Attorney Abukurah represented Davis, apparently with his agreement.

b. *Discussion*

Davis claims the trial court erroneously revoked his in propria persona status twice, in of violation of *Faretta.*  (U.S. Const., 6th & 14th Amends; *Faretta, supra,* 422 U.S. 806.)  We disagree.

(i) *Applicable legal principles*

"A criminal defendant has the constitutional right to forego the constitutional guarantee of the assistance of counsel and to represent himself at trial."  (*People v. Kirvin*, *supra*, 231 Cal.App.4th at p. 1515; *Faretta, supra,* 422 U.S. at pp. 817–818.)  A trial court must grant a self-representation request if the defendant knowingly and intelligently makes a timely and unequivocal request.  (*People v. Boyce* (2014) 59 Cal.4th 672, 702; *People v. Valdez* (2004) 32 Cal.4th 73, 97-98; *People v. Doolin* (2009) 45 Cal.4th 390, 453.)  This right is not absolute.  (*People v. Boyce, supra,* at p. 702.) "The right to self-representation may be abridged when a defendant engages in 'misconduct that seriously threatens the core integrity of the trial'; if the rule were otherwise, the right to self-representation could be perverted into a ' "license not to comply with relevant rules of procedural and substantive law." ' [Citation.]" (*People v. Kirvin, supra,* at p. 1515; see also *People v. Trujeque* (2015) 61 Cal.4th 227, 262-263.) The erroneous denial of a proper *Faretta* request is reversible per se.  (*People v. Boyce, supra,* at p. 702.)

When determining whether the defendant invoked the right to self-representation, we examine the entire record de novo.  (*People v. Weeks* (2008) 165 Cal.App.4th 882, 887; *People v. Watts* (2009) 173 Cal.App.4th 621, 629.)

(ii) *The May 20 Faretta "revocation"*

Davis first argues that the trial court erred by "revoking" his self-representation on May 20, 2013. We do not agree with Davis's characterization of the record. The trial court did not revoke Davis's pro per status on May 20; instead, Davis changed his mind and equivocated upon learning that he, like counsel, would not be able to raise refiling of his case as a defense. As the detailed recitation of events set forth *ante* makes clear, Davis's May 20 self-representation request appears to have been due entirely to his frustration at his counsel's refusal to raise the refiling issue, which Davis mistakenly viewed as central to the case.[12] Davis's three *Marsden* motions were all made primarily on this ground. Once it became clear to Davis at the May 20, 2013 hearing that he could not accomplish his goal even if counsel was out of the picture, the primary reason for assertion of his *Faretta* rights evaporated and he stated: "Well, Your Honor, *I might as well let him go on and do the case then.* I can't say anything. You not giving me no option." (Italics added.) Viewing the record in its totality, it is clear Davis withdrew his self-representation request. (See *People v. Snow, supra,* 30 Cal.4th at pp. 68-70; *People v. Trujeque, supra,* 61 Cal.4th at pp. 262-263 [the right to self-representation, " 'once asserted, may be waived or abandoned,' " and such "abandonment may be inferred from a defendant's conduct"]; *People v. Weeks, supra,* 165 Cal.App.4th at p. 887 [a defendant may, by his conduct, indicate abandonment or withdrawal of a request for self-representation]; *People v. D'Arcy* (2010) 48 Cal.4th 257, 285.)

Davis did not thereafter make an unequivocal *Faretta* request on May 20. When the trial court pressed for an unequivocal declaration that he still wished to represent himself, Davis alternatively stated he (1) wanted to be co-counsel;[13] (2) wanted a

---

[12]    Davis does not raise the refiling issue on appeal.

[13]    " 'It is settled that a criminal defendant does not have a right both to be represented by counsel and to participate in the presentation of his own case. Indeed, such an arrangement is generally undesirable.' " (*People v. D'Arcy, supra,* 48 Cal.4th at pp. 281-282.)  " '[N]one of the "hybrid" forms of representation, whether labeled

26

continuance to allow for self-representation; and (3) wanted private counsel. "Equivocation of the right of self-representation may occur where the defendant tries to manipulate the proceedings by switching between requests for counsel and for self-representation." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1002.) An ambivalent motion, a motion made in passing anger or frustration, or made to frustrate the orderly administration of justice, may be denied. (*People v. Marshall* (1997) 15 Cal.4th 1, 23; see also *People v. Tena* (2007) 156 Cal.App.4th 598, 604; *People v. Scott* (2001) 91 Cal.App.4th 1197, 1206.) Courts "must indulge every reasonable inference against waiver of the right to counsel." (*People v. Marshall, supra,* at p. 20; *People v. Boyce, supra,* 59 Cal.4th at p. 703.) In short, Davis withdrew his *Faretta* request, and did not thereafter make an unequivocal request on May 20. Accordingly, the trial court did not revoke or deny his self-representation right.

Davis argues that the trial court erred by "revoking Appellant's self-representation [request] based upon Appellant's confusion that the trial court helped create." He avers that the court's April 8, 2013 response to his request to act as co-counsel – namely, that such an arrangement was "generally" not feasible and had to be worked out with counsel – led him to believe that he could act as co-counsel. Davis faults the trial court for "revoking" his *Faretta* rights when he thereafter sought "just such an arrangement." Citing, inter alia, *People v. Koontz* (2002) 27 Cal.4th 1041, 1071 he argues that when a defendant "expresses confusion about the contours of his self-representation, a trial court has a duty to explain the scope of that right," and complains that the court failed to fulfill that responsibility here.

We are not persuaded. The trial court's comments on April 8 regarding a co-counsel arrangement were neither ambiguous nor misleading, and could not reasonably have given Davis the impression the court was amenable to allowing him to act as co-counsel. Moreover, the record makes clear that Davis's decision to withdraw his *Faretta*

---

"cocounsel," "advisory counsel," or "standby counsel," is in any sense constitutionally guaranteed.' [Citation.]" (*Id.* at p. 282.)

request was not the result of confusion about the court's willingness to appoint him as co-counsel. To the contrary, as we have explained, Davis withdrew his *Faretta* request because he realized he would be no more able to raise the refiling issue than would counsel. (Cf. *People v. Snow, supra,* 30 Cal.4th at pp. 68-69 [rejecting argument that defendant's withdrawal of his *Faretta* request was ineffective because it was motivated by confusion over whether the court would appoint advisory counsel; although the court made inconsistent statements on the issue, the record showed the withdrawal decision was not based on the contradictory statements].)

(iii) *May 21 Faretta revocation*

Davis next challenges the trial court's revocation of his *Faretta* rights on May 21. He contends he engaged in no misconduct, and any purported misconduct was neither deliberate nor serious and obstructionist. We disagree.

A trial court may terminate a defendant's right of self-representation "for misconduct that seriously threatens the core integrity of the trial." (*People v. Carson* (2005) 35 Cal.4th 1, 6 (*Carson*); *Faretta, supra,* 422 U.S. at p. 834, fn. 46; *People v. Kirvin, supra,* 231 Cal.App.4th at p. 1515.) A ruling revoking a defendant's in propria persona status is reviewed for abuse of discretion, and will not be disturbed absent a strong showing of clear abuse. (*Carson,* at p. 12; *People v. Doss* (2014) 230 Cal.App.4th 46, 54.) We "accord due deference to the trial court's assessment of the defendant's motives and sincerity as well as the nature and context of his misconduct and its impact on the integrity of the trial in determining whether termination of *Faretta* rights is necessary to maintain the fairness of the proceedings." (*Carson, supra,* at p. 12; *People v. Doss, supra,* at p. 54.)

In *Carson,* the issue was whether the defendant's out-of-court misconduct justified the trial court's revocation of his *Faretta* rights. (*Carson, supra,* 35 Cal.4th at p. 6.) The court explained: "Whenever 'deliberate dilatory or obstructive behavior' threatens to subvert 'the core concept of a trial' [citation] or to compromise the court's ability to conduct a fair trial [citation], the defendant's *Faretta* rights are subject to forfeiture. Each case must be evaluated in its own context, on its own facts." (*Id.* at p. 10.) *Carson*

28

enumerated several factors relevant to this analysis. In addition to the nature of the misconduct and its impact on the trial proceedings, other considerations include (1) the availability and suitability of alternative sanctions; (2) whether the defendant was warned that particular misconduct would result in termination of in propria persona status; (3) the actual effect of the misconduct; and (4) whether the defendant has intentionally sought to disrupt and delay his trial. (*Ibid.*)

Consideration of the *Carson* factors here demonstrates revocation of Davis's *Faretta* rights was appropriate. First, we are not faced with Davis's out-of-court conduct, but instead with his misconduct in the course of the trial itself. (See generally *Carson, supra,* 35 Cal.4th at p. 10 [noting that misconduct that is removed from trial proceedings is less likely to affect the fairness of the trial].)

Davis was repeatedly warned that if he raised the refiling issue at trial, his self-representation rights would be revoked. The trial court expressly found Davis's conduct was intentional ("You are clearly trying to get that in front of the jury to taint the trial"), and the record amply supports that finding. Davis's tenacious insistence on raising the refiling issue repeatedly during pretrial proceedings and at trial indicated he was unlikely to abandon his quest to litigate it.

Davis argues that he committed no misconduct because his questions at trial were based on an innocent misunderstanding of the trial court's confusing rulings. He avers that he reasonably believed the court had prohibited him from raising the *legal argument* that the prosecution was barred by the refiling, but was not prohibited from asking questions about the dismissal itself. He urges that he was simply attempting to question the witnesses about a formal complaint he had made regarding Detective Zavala, which he hoped would demonstrate Zavala's bias. To demonstrate such bias, he avers, he had to establish the sequence of events, i.e., that his complaint was filed after the first case was dismissed but before the second case was filed. He posits that a jury might "dismiss a defendant's complaint against a police officer *during* a pending case as a tactical ploy or sour grapes. A jury could fairly conclude, however, that a defendant's complaint made *after* the dismissal of a criminal case is a far more serious matter," demonstrating Zavala

29

had a motive to lie. In his view, his questions were appropriate and consistent with the trial court's rulings, and the trial court failed to understand his argument when he repeatedly stated he was "just trying to get to the question."

We are not persuaded. First, we are not convinced it was necessary for Davis to raise the issue of the dismissal to attempt to show Zavala's purported bias. But even if this had been Davis's goal, he was clearly aware before examining Zavala that the court had prohibited him from asking about the dismissal. When cross-examining Reyes, Davis asked, "You do know that after this case was dismissed, I filed--" and the court admonished, *I told you we're not supposed to talk about that*. I've said it several times." (Italics added.) Davis replied that he was "just trying to get to the question." He did not, however, seek a sidebar to make an offer of proof and explain the theory he now advances on appeal. Instead, when he subsequently examined Zavala, he again asked, "This case was dismissed; correct?" Thus, at least by the time he cross-examined Zavala, Davis had to have known the court was prohibiting him from asking about the dismissal. The trial court could reasonably conclude that Davis did not have an innocent misunderstanding of the ruling, but was attempting to circumvent it. Although Davis argues he tried several times to explain his goal, his explanations never clearly articulated the theory now advanced.[14] In short, the trial court believed Davis was acting deliberately and disingenuously, and the record supports this finding, to which we defer. (*Carson, supra,* 35 Cal.4th at p. 12.)

Further, the court found there was no satisfactory sanction short of revocation available to it, stating, "I don't believe there is anything I can do to prevent you from doing this because you clearly will not follow the court's rules." Given that Davis was

---

[14] Davis also complains that the trial court made confusing evidentiary rulings about the admissibility of his complaint against Zavala. The court allowed Davis to ask whether a witness was aware he had filed a complaint, but precluded him from asking whether the witnesses were testifying at trial due to the complaint. However, the trial court does not appear to have revoked Davis's *Faretta* rights based on questions about the complaints.

repeatedly warned not to raise the refiling issue but disregarded the court's orders, the court's finding was supported by the record. Given the totality of the circumstances, the court was not obliged to accept Davis's assertion that he would refrain from mentioning the dismissal again. Unlike in *Carson*, the misconduct occurred at trial, making alternative sanctions less feasible. Contrary to Davis's argument, a limiting instruction or instructions to disregard improper questions was not a satisfactory alternative, in that the court reasonably believed Davis would continue to engage in the behavior. *People v. Doss, supra,* 230 Cal.App.4th 46, cited by Davis, does not demonstrate the trial court erred in this regard. In *Doss,* the trial court revoked a defendant's *Faretta* rights after the defendant abused his in propria persona jailhouse privileges. The appellate court concluded this was error because the trial court failed to consider the alternative of restricting the jailhouse privileges. (*Doss,* at pp. 56-57.) Here, in contrast, Davis's misconduct occurred at the trial itself.

Finally, the likely effect of the misconduct – intentionally and repeatedly disregarding the trial court's rulings – was inconsistent with the integrity and fairness of the trial. *Carson* recognized that "[n]ot every obstructive act will be so flagrant and inconsistent with the integrity and fairness of the trial that immediate termination is appropriate." (*Carson, supra,* 35 Cal.4th at p. 10.) "By the same token, however, the defendant's acts need not result in a disruption of the trial . . . . The likely, not the actual, effect of the misconduct should be the primary consideration." (*Ibid.*) Although a *Faretta* right cannot be terminated for mere forceful advocacy (*People v. Peyton* (2014) 229 Cal.App.4th 1063, 1081), disobeying the court's orders amounts to more than forceful advocacy. A defendant is entitled to defend himself only so long as he is able and willing to abide by the rules of procedure and courtroom protocol. (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 173-174.)

Davis argues that any misconduct was not egregious enough to rise to the level of serious, obstructionist misconduct. But as explained in both *Faretta* and *Carson,* " 'The right of self-representation is not a license to abuse the dignity of the courtroom.' " (*Carson, supra,* 35 Cal4th at p. 9, citing *Faretta, supra,* 422 U.S. at p. 834, fn. 46.)

31

"Neither is it a license not to comply with relevant rules of procedural and substantive law." (*Carson, supra,* at p. 9.) Indeed, *Carson* cited with approval *State v. Whalen* (1997) 192 Ariz. 103. In *Whalen,* the court terminated the defendant's *Faretta* rights because he refused to conduct his defense from the front of the courtroom due to his mistaken belief crossing the bar would waive jurisdictional objections. (*Carson, supra,* at p. 10.) Even though Whalen's conduct was not deliberately obstreperous, it nonetheless obstructed the court process. (*Carson, supra,* at pp. 10-11.) If this justified revocation of a defendant's *Faretta* rights, certainly Davis's repeated attempts to disregard the court's orders regarding the examination of witnesses does. A trial court in a criminal matter has a duty to control the proceedings. (§ 1044 ["It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."].) A repeated, willful failure to abide by the court's evidentiary rulings undercuts the trial court's control of the proceedings, and thereby threatens the core integrity of trial.

Finally, contrary to Davis's assertion, the record does not suggest the trial court applied an incorrect standard. While the court did not expressly mention *Carson,* its comments indicated it considered the relevant factors.

### 4. *Fines and fees*

The People contend that the trial court erred by failing to impose a $40 court operations assessment (§ 1465.8) and a $30 criminal conviction assessment (Gov. Code, § 70373) on each count. In light of our conclusion that the three counts must be consolidated, this contention is moot.

DISPOSITION

The judgment is modified to consolidate counts 2 and 3 into count 1 and reflect that defendant was convicted of grand theft in violation of sections 484 subdivision (a), 487, subdivision (d)(1), and 487h, subdivision (a); and to vacate the convictions on counts 2 and 3, together with the sentences imposed but stayed on those counts. The clerk of the superior court is directed to prepare an amended abstract of judgment and to forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KITCHING, Acting P. J.

EGERTON, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by Chief Justice pursuant to article VI, section 6 of the California Constitution.